*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

GARY EDWARD HAYNES,

Defendant-Appellant.

FOR PUBLICATION
August 12, 2021
9:10 a.m.

No. 350125
Muskegon Circuit Court
LC No. 18-004131-FH

Before: STEPHENS, P.J., and BECKERING and O'BRIEN, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of knowingly conducting or participating in the affairs of an enterprise through a pattern of racketeering activity (racketeering), MCL 750.159i(1); obtaining or using a vulnerable adult's money or property through fraud, deceit, misrepresentation, coercion, or unjust enrichment (exploiting a vulnerable adult) when the value of the money or property equaled or exceeded $100,000, MCL 750.174a(1) and (7)(a); eight counts of exploiting a vulnerable adult when the value of the money or property had a value of at least $1,000, but less than $20,000, MCL 750.174a(1) and (4)(a); and four counts of failing or refusing to make a tax return or payment, making a false or fraudulent tax return or payment, or making a false statement in a tax return or payment with the intent to defraud or evade the tax (tax fraud), MCL 205.27(1)(a) and (2). The trial court sentenced defendant to serve 90 months to 20 years in prison for each of his convictions of racketeering and exploiting a vulnerable adult involving $100,000 or more, and to serve 30 months to 5 years in prison each for his remaining convictions. For the reasons explained in this opinion, we affirm.

## I. BACKGROUND

Ardis Liddle was 97 years of age at the time of trial. During the time period relevant to the crimes at issue (roughly 2007 through 2016), she lived alone but had numerous people come over to help her with various tasks—she had a nurse to help with her medication, and friends and relatives to help with running errands, going to appointments, and doing household chores like laundry and cleaning. At the time of trial, Liddle needed a walker to get around because she had bad knees, she could not go up and down stairs, she had arthritis in her hands, she had a pacemaker,

-1-

and she had poor vision and trouble hearing. Liddle's doctor testified about her mobility issues and stated that she had a history of falling and suffering injuries—she had a closed-head injury from a fall in 2006, she once fell and fractured her nose, another time she fell and fractured her orbital bone, and still another time she fell and broke her spine.

Liddle said that she met defendant at a "symposium" that he held for elderly people. Defendant believed that this event took place in 2007. Liddle testified that defendant conducted the meeting in the name of a company, but she could not recall the company's name. She remembered that defendant discussed how one should handle money and "things like that." After the meeting, Liddle approached defendant and spoke to him. She asked him for help paying bills "because everyone was paying them on-line" and she was not familiar with how to use a computer. Defendant agreed to help her, and he began coming to her home to pay her bills on the computer. Liddle did not supervise defendant and did not know how he paid her bills, but she had given him a password for her bank account. The only password he was supposed to have was for her account with Chase. Before defendant started helping her with her bills, Liddle received paper bank statements by mail, but that did not last long after defendant began helping her.

Liddle testified that defendant would also sometimes help her with things around the house, such as changing a lightbulb and fixing a screen door. Other people that would come over to help Liddle sometimes saw defendant helping her.

At one point after defendant began helping her with her bills, Liddle was sent to a nursing home to recover from an injury because the hospital "didn't want [her] to stay alone at home." Defendant visited Liddle at the nursing home and told her that the nursing home "would take [her] money." Defendant also told her that he could put her money "in a safe place" so that the nursing home could not take it. According to Liddle, defendant said that he would put her money into an annuity. Liddle told defendant how upset she was about being in a nursing home and how she wanted to leave, and defendant eventually showed up with a pickup truck and moved her out.

Liddle characterized her relationship with defendant at the relevant time as friends. She explained that she even went to his daughter's play and met defendant's wife and children.

That friendship deteriorated in 2016 when Liddle discovered problems with her finances. Ryan Rimedio, who in 2016 was a bank manager for a Chase branch, testified that Liddle came into his branch in September 2016 and seemed confused, rattled, and frustrated. She told him that she could not get access to her money—specifically an annuity. Rimedio asked Liddle to get her documents together and bring them into the branch. She came back a few weeks later with her documents, and he reviewed them.

Rimedio was able to obtain a copy of an endorsed check from Liddle's annuity company. The check was a "huge red flag" for him because it was endorsed directly to a business. He explained that such checks are usually deposited by the client into his or her own account and then the client would write a separate check to the investment company. Liddle also gave him a copy of an investment statement from Future By Design—one of defendant's businesses. Rimedio opined that the statement looked homemade. Liddle also gave Rimedio a business card with defendant's name on it, and Rimedio thought the card looked homemade too. While Liddle sat in the office with him, Rimedio called defendant and explained that Liddle was looking for her

money, and defendant responded that he needed a few days to get the money. According to Rimedio, the money never came, but Rimedio did not call the police department about this case.

Donald Stenberg, Liddle's nephew, testified that he traveled the nation in a motor home and would stop and visit Liddle once or twice a year. At one such visit in September 2016, Liddle told Stenberg that she was concerned about her money, so he scheduled an appointment with defendant to discuss the matter. Defendant agreed to come by Liddle's home, and they had a meeting on September 29, 2016. At the meeting, defendant told Stenberg that he had so many clients that he could not state where he had invested Liddle's money. Stenberg warned defendant that if defendant did not get the information to Stenberg by the next day, then Stenberg would take Liddle to the police department to file a report. According to Stenberg, defendant called the next day and told Stenberg that he had invested about $117,000 of Liddle's money in a house-flipping business. He said that he could get Liddle $38,000 right now, but the remainder would take six to eight weeks because the business had to sell houses. According to Stenberg, he told defendant that this was unacceptable and then took Liddle to the police department to file a report.

Detective Sergeant Bryan Rypstra investigated Liddle's report. He spoke with defendant, and defendant told him that he met Liddle at a seminar that he had held. Defendant also told Detective Rypstra that Liddle lent him the money, which was evidenced by a note, and that he had invested the money into a house-flipping and rental-unit business. According to the detective, defendant said that he had already spoken to Liddle and had informed her that he would pay back the $142,000 that she had lent him. Detective Rypstra felt the matter was civil, not criminal, and closed the report.

The matter eventually made its way to Special Agent Kevin Hiller with the Child, Elder, and Family Financial Crimes Unit of the Attorney General's office, who began investigating defendant in June 2017 after the Attorney General's office received a complaint from the Department of Licensing and Regulatory Affairs. Special Agent Hiller met with Liddle at her home in June 2017, and met with various relatives, friends, and doctors of Liddle. As part of his investigation, Special Agent Hiller also requested all documents relating to various businesses associated with defendant.

Richard Boyle, Jr. worked as a financial specialist for the same department as Special Agent Hiller, and at trial he was admitted as an expert on bank recordkeeping. Boyle reviewed bank records held by defendant and his various businesses. Boyle testified about an account for Senior Planning Resource—one of defendant's businesses—that listed defendant as a signatory. A check from Liddle for $20,000 was deposited into that account on October 28, 2011. There were also two $5,000 checks from Liddle's account deposited into the Senior Planning Resource account on December 31, 2011. A check for Liddle from National Western Life Insurance Company in the amount of $117,490.42 was deposited into the Senior Planning Resource account on May 24, 2012. There was also a check associated with Liddle's annuity from Aviva for $107,735.10 that was deposited into the account for Senior Planning Resource. Before that deposit, the account had a balance of $3.98.

The prosecution produced records for each of these transactions and showed them to Liddle. Liddle could not recall writing the $20,000 check to Senior Planning Resource, and could not think of any reason that she would write such a check. She only believed that she wrote the

check because her name appeared on it. For the two $5,000 checks, Liddle similarly testified that she did not recall writing or signing the checks, and had no idea why she would write two $5,000 checks to Senior Planning Resource. When the prosecution showed Liddle the check issued by National Western Life Insurance company for $117,490.42 payable to Liddle that had written on the back "Paid to the Order of Senior Planning Resource," Liddle denied that she intended to sign over that check to Senior Planning Resource. The prosecution also showed Liddle records from Aviva, which included a letter dated March 3, 2011, stating, "Enclosed is our Check Number 304464 in the amount of $107,735.10." Liddle testified that she had never seen the records from Aviva and that she did not intend to surrender that annuity. The prosecution also showed Liddle a check from Aviva that was endorsed and had written on the back, "Pay to the Order of Senior Planning Resource." Liddle denied that she ever saw the check and said that she never endorsed it.

The financial investigator, Boyle, testified that the Senior Planning Resource account that Liddle's money had been transferred to did not show typical business expenses—it showed no payroll or business accounting expenses. Instead, it showed numerous personal expenses: car repairs, gas, oil changes, groceries, restaurants, hotels, phone charges, air travel, credit card and loan payments, and payments made to defendant's family, which included college tuition payments. Boyle concluded that the funds deposited from Liddle into the Senior Planning Resource accounts were used for defendant's personal expenses and not to benefit Liddle. Boyle did not find any indications that the money was used to purchase an annuity.

Boyle also testified about another account associated with defendant doing business as "Future By Design, LLC," which was confirmed to be one of defendant's businesses. The records for that account showed that there was a check from Liddle in the amount of $14,000 deposited on October 31, 2013. Another check from Liddle for $13,000 was deposited on December 2, 2013. The records showed that a $12,000 transfer was made from Liddle's account to the Future By Design account on July 14, 2014. There was also an online payment of $1,000 from Liddle's account to Future By Design on July 29, 2014.

The prosecution at trial produced records reflecting each of these transactions and asked Liddle about them. For the $14,000 check, Liddle stated that she did not intend to transfer that money to Future By Design even though it appeared that the signature was hers. For the $13,000 check, Liddle testified that she did not recall intending to write the check and could not recall why she would have written such a check to Future By Design. For the $12,000 transfer, Liddle denied making the transfer and denied intending to transfer that sum to Future By Design, defendant, or any of defendant's businesses. Likewise, for the $1,000 transfer in July 2014, Liddle denied that she intended to transfer that amount to Future By Design, defendant, or Senior Planning Resource.

Boyle testified that up until April 2013, the Future By Design account had very little activity—low balances and general spending on gas, food, shopping, and other basic personal items. Starting in May 2013, there were large deposits, which coincided with defendant's withdrawals increasing dramatically. There were more than 30 cash withdrawals in that time totaling $32,000. There was also significantly increased spending on rent, shopping, credit cards, bars, and furniture, and there were large payments to various persons.

Boyle testified about another account associated with Future By Design for which defendant was a signatory. That account was opened with a $5,000 deposit from Liddle's account. The only transfers were for $4,500 and $450 to defendant's personal banking account. Boyle testified that there were also several $1,000 deposits from Liddle's account to yet another account associated with Future By Design: one on May 27, 2015; one on June 16, 2015; and one on July 13, 2015.

The prosecution produced records of these transactions as they related to Liddle and asked her about them. For the $5,000 deposit, Liddle denied that she wanted that payment to occur. For each of the $1,000 transfers, Liddle denied that she intended for the transfer.

As a general matter, Liddle testified that she did not give defendant permission to cash her annuities and deposit the funds in his own bank accounts. She further denied that she ever agreed to loan defendant money. She also did not agree to invest in defendant's business and did not agree to engage in "house-flipping."

Richard Grandy, Jr., testified that he was a specialist with the Michigan Department of Treasury. He was with the unit that handled the authorized disclosure of confidential tax information. He processed the request for tax information from the Attorney General's office. His staff determined that there were no tax records filed for a business named Future By Design from 2011 through 2016. He also verified the jointly filed tax returns for defendant and his wife from 2011 through 2016.

Scott Darnell with the Michigan Department of Treasury in the Tax Enforcement Unit was certified as an expert in tax enforcement and testified that he reviewed defendant's taxes for tax years 2011 through 2015. Darnell stated that stolen or embezzled money must be reported as income, yet there was no evidence that defendant reported the income from the $117,490.42 deposited from Liddle in tax year 2012. There was also no evidence that defendant reported the checks from Liddle for $14,000 and $13,000 that were deposited into Future By Design's accounts in 2013. There was also no evidence that defendant reported income from Future By Design that reflected the $12,000 and $1,000 payments that it received from Liddle in 2014. There was similarly no evidence that defendant reported the $5,000 and $1,000 deposits from Liddle in 2015.

Darnell admitted that the principal balance of a loan is not taxable income. He also agreed that taking money from someone to invest might not be income depending on the circumstances.

Defendant testified in his defense. He described himself as an "[e]ntrepreneur, independent businessman." He stated that he was a licensed insurance agent and a registered investment advisor. He had his own business called Senior Planning Resource. As part of that business, he would hire a firm to send out a mailing for a seminar, and then he would host the seminar for seniors interested in investing their money. After the seminar, defendant would set up appointments with anyone who expressed interest. He estimated that he had about 50 clients.

According to defendant, Liddle had been one of his clients from 2007 through "this incident." Defendant stated that Liddle had mobility issues, but was intelligent and meticulous, and to that end she kept journals in which she wrote out her financial information. He never saw anything that would suggest to him that Liddle was incompetent.

Defendant said that the first thing he did for Liddle was help her set up an estate plan. While doing so, he noticed that she had five or six certificates of deposit with banks. He worried that the income from her certificates of deposit would have adverse tax consequences for her social security, so he recommended that she move the money to a "tax-deferred vehicle." He recommended an annuity.

Defendant said that he would help Liddle with various chores—he would change light bulbs, help her with her Christmas decorations, do minor repairs, and help her move furniture. According to defendant, they were friends, and he would take her to dinner on her birthday.

Defendant said that within a year or two, he started paying Liddle's bills for her. Liddle gave defendant her password and sat beside him 95% of the time when he paid her bills. Defendant said that Liddle kept track of every payment. He also said that he never touched Liddle's checks.

Defendant agreed that he had seen the checks that the prosecutor admitted and testified that he recognized the signatures on each check as Liddle's signature. Defendant denied that he ever signed the checks. He stated that Liddle knew about every check—whether electronic or paper— and approved each. He also disagreed with the bank manager who testified that it was irregular to just endorse a check over to another party for an investment; he stated that it was actually a common practice. He said that Liddle herself signed the surrender documents for the insurance company.

According to defendant, he discussed investing in real estate with Liddle, and she agreed to lend him money for his real estate projects. Defendant said that he expected to pay Liddle interest and had repaid some of that money. According to defendant, none of the loans were past due. He explained that some of the online transactions occurred because Liddle wanted him to bring her cash, and he would transfer the money and then bring her cash. But he said that Liddle approved every transaction.

Defendant said that, at first, he prepared a note to memorialize the loans, but as they continued to have transactions, Liddle just kept notes in one of her journals. He stated that it was a mistake for him to not make a copy of the journal.

Defendant identified a copy of a promissory note that showed that Liddle lent Future By Design $116,353.90. He stated that Liddle had the original note. Defendant said that Liddle verbally agreed to extend the maturity date of the note, and that Liddle told him not to put investments in her name because she wanted to avoid the Medicaid look-back period. He also said that Liddle knew she was not investing in annuities and that she agreed to invest in real estate. He acknowledged using some money for personal expenses, but said that he only did so when Liddle agreed to it.

Defendant denied that he misstated his taxes, and he testified that every dollar that he got from Liddle was with her permission. He also admitted that his tax returns did not reflect any income from his taking of Liddle's money, but he said that was because the money was loaned to him and was therefore not income. Defendant also explained that he did not file tax returns for his entities because one was just a "DBA" and the other was a pass-through entity, so he did not need to file taxes for either of them. He explained that the taxes were part of his personal return.

The jury eventually found defendant guilty as charged on each of the 14 counts. He now appeals as of right.

## II. JUROR MISCONDUCT

Defendant first argues that comments made by prospective jurors during voir dire about those jurors' biases tainted the jury, warranting a mistrial. We disagree.

## A. STANDARD OF REVIEW

To preserve a claim that there was an irregularity warranting a mistrial, defendant had to move for a mistrial in the trial court and assert the same ground for relief before the trial court that he asserts on appeal. See *People v Clark*, 330 Mich App 392, 414; 948 NW2d 604 (2019); *People v Eccles*, 260 Mich App 379, 385; 677 NW2d 76 (2004). Although defendant objected when the prosecutor sought to further question certain prospective jurors about their biases in favor of law enforcement, defendant did not move for a mistrial or request any other relief rising from his belief that the prospective jurors were tainted by the comments made by the excused jurors. Therefore, he has not preserved this claim for appellate review. This Court reviews unpreserved errors for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

## B. ANALYSIS

Defendant had the right to be tried by an impartial jury. See *People v Rose*, 289 Mich App 499, 529; 808 NW2d 301 (2010). A trial court ensures that a jury is impartial by conducting voir dire and removing biased jurors before impaneling the jury: "The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury." *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994) (opinion by MALLET, J.). To the extent that defendant maintains that the process did not result in an impartial jury, defendant has the burden to show that a particular juror was not impartial or, at the very least, that the juror's impartiality was in reasonable doubt. See *Rose*, 289 Mich App at 529.

In this case, the trial court and counsel for the parties extensively explored whether the prospective jurors might have biases arising from the nature of the events at issue. The trial court and parties inquired particularly into whether the prospective jurors held any biases for or against law enforcement witnesses, and whether the prospective jurors would be able to remain impartial given that the charges involved alleged crimes against an elderly woman.

When the prosecutive jurors were asked how they might feel about witnesses who are police officers, prospective juror DB said that he was a "firm believer in the police and a firm supporter of the police." Later, DB did not raise his hand when the jurors were asked to raise their hands if they could be fair and impartial. When the prospective jurors were asked if they had any family in law enforcement, DB said that he had family that worked in corrections, but assured that this fact would not affect his ability to be impartial. He further agreed that he would follow the court's instruction and give the same weight to an officer's testimony that he would give to any other witness.

Notwithstanding his earlier agreement that he would not give additional weight to testimony by officers, DB later mentioned that he had a background in the military and knew a bit about police procedures. He stated that, given the number of counts and the lengthy span of time covered by those counts, the prosecutor would not be sitting "here unless there was some type of evidence that they're bringing forth." He reiterated that he already had a bias. He explained that police officers would not be here unless there was a reason. Defense counsel thanked him for being "man enough to sit there and tell us" about his bias; counsel also stated that he would be asking DB "to leave this panel."

Defense counsel then asked if the remaining jurors would be willing to "wait until the end of the trial to see how this book is written?" They all agreed that they would. He also asked if they would be willing to uphold the presumption of innocence until proven guilty. They again agreed.

The prosecutor then questioned individual jurors who had expressed feelings of bias. Prospective juror AB previously indicated that she had worked with the elderly and was sensitive "to people doing things to the elderly that [she] view[ed] as wrong," and that the number of counts and length of time made her think that the prosecution had a significant amount of evidence against defendant such that she could not give defendant a fair shake. When the prosecutor sought to explore these potential biases further, AB reiterated that she was unsure whether she could set aside her experiences with the elderly. Accordingly, the trial court excused her for cause. The prospective juror who replaced AB indicated that she did not have any of AB's same concerns.

Next the prosecutor turned to prospective juror BL, who previously stated that, because her mother had been abused when she was elderly, there was "no way [she] could be anything but against." When asked by the prosecution to explain her bias further, BL began to cry and said that this "exact thing happened" to her mother, so she could not be impartial. The trial court excused her for cause.

The prosecutor then turned to prospective juror BW, who had previously mentioned that he had police officers for friends and opined that there was no way that the officers would be in court if nothing happened, so he would be biased. When the prosecutor again asked BW about this bias, BW confirmed that he had a bias in favor of law enforcement. Nevertheless, the trial court refused to excuse BW for cause because BW had indicated that his job required him to work against fraud, and BW had agreed that he understood how to evaluate evidence to determine whether there had in fact been fraud.

Then the prosecutor began to question DB about the biases he previously stated that he held, at which point the trial court interjected, saying that the parties had already heard DB's views. The court inquired whether it was really necessary to ask further questions. When the prosecutor said that it was, defense counsel objected and opined that, at this point, further questioning would "contaminate" the record. The trial court agreed and stopped the questioning. The court stated that it would excuse the other prospective jurors should the prosecutor wish to continue questioning DB. After DB reiterated that he would be unable to follow the court's instructions, the prosecutor agreed that he should be removed for cause, and the trial court ordered him removed.

A replacement prospective juror, TJ, then expressed concerns about the number of charges. TJ, however, agreed that he could follow the court's instructions. All subsequent replacement jurors each agreed that they could be impartial and follow the court's instructions no matter how many charges a person faced. The defense excused prospective jurors TJ and MR (who had previously suggested that she may have a bias in favor of law enforcement witnesses), and their replacements agreed that they would be able to follow the court's instructions.

This record demonstrates that the trial court removed for cause the majority of the prospective jurors who expressed a potential bias in favor of the prosecution, and that defense counsel used his peremptory challenges to remove the remainder. Each of the remaining jurors affirmed that they would be impartial and that they would be able to follow the trial court's instructions. Accordingly, defendant has not met his burden to show that the impartiality of any one juror was in reasonable doubt. See *Rose*, 289 Mich App at 529.

Nevertheless, relying on the decision in *People v Sowders*, 164 Mich App 36, 47; 417 NW2d 78 (1987),[1] defendant maintains that the presence of the prospective jurors during the questioning of other prospective jurors who expressed biases tainted the entire jury pool. This Court's decision in *Sowders* does not support that proposition.

In *Sowders*, this Court recognized that jury misconduct would not warrant relief unless the misconduct was such that it affected the impartiality of the jury or disqualified them from exercising the powers of reason and judgment. *Id*. at 47. The Court then concluded that, on the record before it, it did not appear that the prospective juror's remark about the police department had any effect on the impartiality of the jury. *Id*. at 47-48. Like the defendant in *Sowers*, defendant in this case has not shown that the remarks by some of the prospective jurors had any effect on the impartiality of the jury.

Defendant also argues that the jury was improperly exposed to extraneous evidence, as discussed in *People v Budzyn*, 456 Mich 77, 88-89; 566 NW2d 229 (1997). It is unclear how prospective jurors' answers to questions about their personal beliefs constituted extraneous evidence. But assuming without deciding that this was extraneous evidence, defendant has not shown that there was "a real and substantial possibility that [the extraneous influences] could have affected the jury's verdict." *Id*. at 89.

Counsel for both parties asked each of the prospective jurors selected to replace the prospective jurors who were removed if he or she could decide the case on the facts and follow the trial court's instructions. Each juror agreed that he or she could. The trial court also administered an oath to the jurors, and they each swore to "justly decide the questions submitted" to them, to render "a true verdict," and to render that verdict "only on the evidence introduced and in accordance with the instructions of the Court." Finally, the trial court instructed the jurors that they were to decide the case on the basis of the admitted evidence and not on the basis of any

---

[1] Decisions published before November 1, 1990, are not binding on this Court. See MCR 7.215(J)(1). However, those decisions are entitled to deference under traditional principles of stare decisis and should not be lightly disregarded. See *People v Bensch*, 328 Mich App 1, 7 n 6; 935 NW2d 382 (2019).

biases, sympathy, or prejudice, and that they should not consider the fact that defendant had been charged with more than one crime. Jurors are presumed to follow their instructions, see *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), and are presumed to be impartial, see *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001). Defendant has not rebutted those presumptions.

On this record, it cannot be said that the trial court plainly erred by failing to sua sponte grant a mistrial. See *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014) (stating that a trial court should only grant a mistrial when the prejudicial effect of an error is so egregious that it cannot be removed in any other way).[2]

## III. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that the prosecution failed to present sufficient evidence establishing that Liddle was a vulnerable adult, that defendant intended to defraud or evade taxes, and that defendant engaged in the necessary predicate racketeering offenses to support his conviction for racketeering. We disagree with all of defendant's arguments.

## A. STANDARD OF REVIEW

As explained by this Court in *People v McFarlane*, 325 Mich App 507, 513; 926 NW2d 339 (2018):

> This Court reviews a challenge to the sufficiency of the evidence by examining the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. This Court must resolve all conflicts in the evidence in favor of the prosecution. [Quotation marks and citations omitted.]

## B. VULNERABLE ADULT

Defendant first challenges whether the prosecution presented sufficient evidence to establish that Liddle was a "vulnerable adult" because, according to defendant, the evidence

---

[2] Defendant alternatively argues that his trial counsel provided ineffective assistance by not moving for a mistrial. We disagree. The record shows that defense counsel thoroughly vetted the prospective jurors and intervened to prevent further questioning that might have contaminated the jury pool. He also used peremptory removals to remove the remaining prospective jurors who had expressed some degree of bias. A lawyer in defense counsel's position could have reasonably concluded that the voir dire adequately identified the jurors with biases and that the remaining jurors were capable of being fair and impartial. Moreover, given that there was no evidence that any of the jurors held a bias, or were unable or unwilling to follow the trial court's instructions, there would have been no grounds to move for a mistrial, and counsel cannot be faulted for failing to make a frivolous motion. *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015).

-10-

showed that Liddle had only minor physical ailments and was otherwise mentally capable of handling her own affairs.

Defendant was convicted under MCL 750.174a(1), which requires the prosecution to prove that the victim was a "vulnerable adult" and that the defendant knew or had reason to know that the victim was a vulnerable adult. The Legislature defined a vulnerable adult to be, in relevant part, an "individual age 18 or over who, because of age, developmental disability, mental illness, or physical disability requires supervision or personal care or lacks the personal and social skills required to live independently." MCL 750.145m(u)(*i*); see also MCL 750.174a(15)(c) (stating that the term vulnerable adult has the meaning stated under MCL 750.145m). This Court has analyzed that definition, albeit as applied in the context of elder abuse, and determined that the prosecutor must show that the four personal characteristics stated under the statute—age, developmental disability, mental illness, or physical disability—"affect the individual in such a way that the individual (a) requires supervision, (b) requires personal care, or [(c)] lacks the personal and social skills required to live independently." *People v Cline*, 276 Mich App 634, 645; 741 NW2d 563 (2007). Although there was testimony that Liddle was mentally and physically able to care for herself, there was also strong evidence from which a jury could have found that Liddle was a vulnerable adult within the meaning of MCL 750.145m(u)(*i*).

Liddle testified that she was 97 years of age at the time of the trial and that she had issues with her mobility. Liddle's physician discussed Liddle's mobility issues and testified that the issues were severe as early as 2006. He noted that Liddle had been using a cane or walker since 2009. The physician also explained that he had long had concerns about Liddle's decision to live alone, but that he had "lost that battle" because Liddle was "very headstrong" and would rather be "gone" than live in an assisted living facility.

Others testified about the help that Liddle needed. Cheryl Cray explained that she went to Liddle's home a couple times a week from 2005 through 2013 to help Liddle with her basic needs like chores, getting to appointments, and shopping. Cray also had to get Liddle's mail because the mailbox was surrounded by concrete and Liddle had once fallen and injured her head while retrieving mail.

In 2013, Cray could no longer help Liddle, so Jacklyn Elliot took over. Elliott testified that she did many of the same things for Liddle that Crays had done. Elliott stated that Liddle was no longer able to use the stairs by the time she started helping her. When Elliott was no longer able to help Liddle, she went to some lengths to notify others because she "wanted to know that someone from the family would be helping" Liddle after Elliot left.

Liddle herself also testified that she had trouble using a computer. She explained that she first approached defendant about assisting her with her bills. She entrusted the password and account information for one of her accounts to defendant so that he could pay her bills using the funds from that account. Although defendant testified that Liddle was intelligent, meticulous, and well aware of her financial situation, the fact that she could not even use a computer to pay her own bills suggested that she did not have basic computer literacy and would be unable to monitor financial transactions that were done through the computer. Additionally, Liddle testified that she stopped receiving paper statements after defendant took over paying her bills. This evidence suggested that Liddle was at the mercy of anyone she entrusted to pay her bills electronically.

-11-

All of this testimony taken together established that Liddle needed significant assistance in order to lead her life. A reasonable jury hearing this testimony could find that Liddle had restricted mobility and that her mobility issues made her reliant on others to shop, get to doctor's appointments, and obtain her mail. She was also at risk of falling and sustaining an incapacitating injury. Given the fall risk, a reasonable jury could infer that Liddle needed supervision, even if she herself was unwilling to admit as much. See MCL 750.145m(u)(*i*). A reasonable jury could also infer that Liddle was not computer literate and could not handle her financial needs to the extent that she had to rely on a computer to do so. The jury could also infer that Liddle was vulnerable to anyone that she entrusted with her account information. Consequently, viewing the evidence in the light most favorable to the prosecution, see *McFarlane*, 325 Mich App at 513, there was evidence that Liddle was not fully able to live independently, see *Cline*, 276 Mich App at 645-646 (holding that evidence that a person requires some level of personal care as a result of her conditions was sufficient evidence to establish that that person was a vulnerable adult).

The prosecution also presented sufficient evidence from which a reasonable jury could find beyond a reasonable doubt that defendant knew or should have known that Liddle was a vulnerable adult. Both Elliott and Crays stated that they met defendant on various occasions when they were helping to care for Liddle. From that testimony, a reasonable jury could infer that defendant knew that Liddle received at least some level of care from others. Additionally, Liddle testified that she needed assistance paying her bills with a computer and that she elicited defendant's help to do that. Liddle was obviously elderly and used a cane and walker during the periods at issue. Moreover, defendant knew that Liddle had been placed into an assisted living facility for a time—he helped Liddle move out of the facility. Accordingly, the prosecution presented sufficient evidence to permit the jury to find beyond a reasonable doubt that Liddle was a vulnerable adult and that defendant knew or at the very least should have known that she was a vulnerable adult. See *McFarlane*, 325 Mich App at 513; *Cline*, 276 Mich App at 645-646.

## C. TAX FRAUD

Defendant next argues that the prosecution failed to present sufficient evidence that he had the requisite intent to commit tax fraud.

To prove tax fraud, the prosecution had to, in relevant part, present evidence from which a reasonable jury could find beyond a reasonable doubt that defendant made a "false or fraudulent return or payment," or made a "false statement in a return or payment." MCL 205.27(1)(a). The prosecution also had to present evidence that defendant did so with the "intent to defraud or to evade" the payment of a tax. MCL 205.27(2); see also *People v Schmidt*, 183 Mich App 817, 822; 455 NW2d 430 (1990) (stating that the violation must be done with the intent to defraud or evade the payment of tax).

The evidence showed that defendant obtained more than $300,000 of Liddle's money over a span of years and that he did not report any of that money as income on his tax returns for the years involved. Defendant took the position at trial, and continues to argue on appeal, that he did not have to report the more than $300,000 on his tax returns because that money was supposedly loaned to him or given to him to invest on Liddle's behalf, which means that the money was not taxable income. To be sure, if Liddle retained ownership of the funds and the proceeds from the funds—as would be the case with invested funds—those funds would not be income to defendant.

See MCL 206.2(3) (providing that the income subject to taxation in Michigan is the same as the taxable income defined and applicable to the taxpayer under the Internal Revenue Code, except as otherwise provided under Michigan law); MCL 206.30(1) (defining Michigan's taxable income to mean adjusted gross income as defined under the Internal Revenue Code); 26 USC 61(a) (defining income for purposes of taxation under the Internal Revenue Code). Likewise, the principal balance of a loan does not constitute taxable income to the borrower. See *Comm'r of Internal Revenue v Tufts*, 461 US 300, 307; 103 S Ct 1826; 75 L Ed 2d 863 (1983) (holding that the principal of a loan is not income).[3] Nevertheless, there was compelling evidence that Liddle did not authorize either the transfer of any funds to defendant as an investment or a loan to defendant or any of his entities.

Liddle testified at trial that she did not give defendant permission to cash her annuities and deposit them into his own banking accounts. She also denied that she ever lent money to defendant or agreed to invest in any of his real estate ventures. She stated that she only ever gave defendant the information for one bank account, and she only did that so that he could pay her bills online with that account. This testimony by Liddle, if credited by the jury, would be sufficient to conclude that Liddle did not invest money with defendant or lend him the money.

Moreover, defendant's testimony that Liddle did indeed invest or lend the money to him was difficult to believe. To do so would require believing that a nonagenarian would transfer all of her wealth and not expect to be repaid until she was nearly one hundred years of age. This was even more difficult to believe in light of the unanimous testimony that Liddle was determined to avoid a nursing home, and Liddle's testimony that she was financially secure enough to live out her days in her own home. It seems highly unlikely that, under those circumstances, Liddle would voluntarily impoverish herself in order to further defendant's investment schemes. In any event, there was evidence beyond Liddle's testimony that permitted an inference that defendant took Liddle's money without permission and that he spent her money on his own personal expenses.

Bank manager Rimedio testified that Liddle came to him and was confused, rattled, and frustrated about being unable to obtain her funds. The bank manager helped Liddle track down what happened to her annuity and learned that it had been liquidated and signed over to one of defendant's businesses. When the bank manager called defendant, defendant stated that it would take a few days for him to get the money, but the money never came. Similarly, Liddle's nephew, Stenberg, testified that he too spoke to defendant about Liddle's money, and that defendant admitted to taking Liddle's $117,000 and investing it in a house-flipping enterprise. Defendant said that he would get her $38,000 immediately and the rest in a few weeks, but the money was never returned to Liddle.

In reviewing the sufficiency of the evidence, this Court must draw every reasonable inference in favor of the prosecution. See *People v Hardiman*, 466 Mich 417, 428; 646 NW2d

---

[3] Because our Legislature provided that Michigan's taxable income was the same as under the Internal Revenue Code except as otherwise provided under Michigan's tax code, we look to federal decisions interpreting and applying the Internal Revenue Code as to what constitutes income under the Internal Revenue Code. See, e.g., *Cook v Dep't of Treasury*, 229 Mich App 653, 660; 583 NW2d 696 (1998) (stating that, under MCL 206.2(3), Michigan's income tax must be calculated in the same manner that it would be under the federal Internal Revenue Code).

158 (2002). Moreover, if evidence is relevant and admissible, it does not matter that the evidence gives rise to multiple inferences or further inferences; it is for the jury alone to determine what inferences to draw. *Id*. Rimedio's and Stenberg's testimonies permitted an inference that Liddle had no idea that defendant had taken her money, which directly contradicted defendant's claim that Liddle authorized the transfers and kept meticulous records of having done so. Defendant's comments to Rimedio and Stenberg similarly evidenced that he was attempting to forestall investigation into his activities, which suggested consciousness of guilt. This in turn permitted an inference that defendant was lying when he testified that Liddle transferred more than $300,000 to him—which represented nearly all of her wealth—as loans or investments, and that he was lying because he had in fact stolen Liddle's money. See *id*.

There was also evidence that defendant used the money to pay for personal expenses. Evidence showed that defendant used Liddle's money to pay for groceries, restaurants, hotels, flights, car repairs, and personal goods, among other things. There was even evidence that defendant used Liddle's money to pay his children's college expenses. There was no evidence, however, that he invested the money into an annuity or into a real estate venture. Additionally, although some of the accounts were ostensibly business accounts, there was testimony that the account activity was inconsistent with the kinds of transactions one would see in a legitimate business account. Under the totality of the evidence, a reasonable jury could find that defendant took Liddle's money without permission, converted it to his own use, and intended to cheat Liddle when he did so. Indeed, the evidence was sufficient to establish that defendant embezzled Liddle's money, even if Liddle had transferred the money to him in trust. See *People v Schrauben*, 314 Mich App 181, 198; 886 NW2d 173 (2016) (stating the elements of embezzlement under MCL 750.174). Accordingly, even if Liddle had not testified that she never authorized the transfer of any money to defendant, the prosecution presented sufficient evidence to establish that defendant embezzled Liddle's money.

In the absence of any basis for concluding that Liddle's testimony was so deprived of evidentiary value that no reasonable jury could rely on it, it was for the jury alone to determine whether to believe Liddle's version of events or defendant's version of events. See *People v Lemmon*, 456 Mich 625, 643-644, 646-647; 576 NW2d 129 (1998). The jury ultimately rejected defendant's version of events and found that he took Liddle's money without permission, and there was ample record evidence to support that finding. See *McFarlane*, 325 Mich App at 513.

Because there was evidence to support the finding that defendant unlawfully converted Liddle's money to his own use, the jury could reasonably find that defendant had income from his illegal activities. Illegally obtained income must be reported under the Internal Revenue Code. See *James v United States*, 366 US 213, 219; 81 S Ct 1052; 6 L Ed 246 (1961) (holding that unlawful gains—including gains from embezzlement—constitute an accession to wealth that is income within the meaning of 26 USC 61(a)). Therefore, income from illegal activities must be reported under Michigan law as well. See MCL 206.2(3); MCL 206.30(1).

At trial, there was evidence that defendant did not file separate tax returns for his entities. Additionally, there was evidence that defendant did not report the more than $300,000 that he obtained from Liddle on his personal tax returns for the relevant tax years. This Court has held that evidence that a taxpayer failed to file a tax return is sufficient evidence to allow a jury to find that the taxpayer intended to evade the tax that would have been due with the return. See *People*

-14-

*v Paasche*, 207 Mich App 698, 713; 525 NW2d 914 (1994). By the same measure, the evidence that defendant failed to include his unlawful income on his tax returns during the relevant tax years was sufficient to establish the requisite intent for tax fraud in those years. See *id*. The evidence that the illegal proceeds constituted a significant portion of defendant's income and that he used the illegal income to pay his everyday expenses was also evidence that he understood that the illegal gains constituted income that should be reported. See *United States v Ytem*, 255 F3d 394, 396-397 (CA 7, 2001) (noting that the evidence was sufficient to establish the intent to defraud because the illegal income constituted a substantial portion of the taxpayer's income and the taxpayer used the illegal income to pay the sorts of things that people normally defray with taxable income).[4] "Furthermore, the fact that illegal income is taxable is widely known, even among lay people." *Id*. at 397 (citing the famous example of Al Capone). The prosecution therefore presented sufficient evidence to establish that defendant had income in the form of money embezzled from Liddle and that he deliberately failed to include that income on his personal tax return in order to evade the tax on his illegal gains. See *McFarlane*, 325 Mich App at 513.

## D. RACKETEERING

Finally, defendant argues that the prosecution failed to present evidence that he committed the crime of racketeering. To establish the crime of racketeering, the prosecution had to establish the following elements:

> (1) an enterprise existed, (2) defendant was employed by or associated with the enterprise, (3) defendant knowingly conducted or participated, directly or indirectly, in the affairs of the enterprise, (4) through a pattern of racketeering activity that consisted of the commission of at least two racketeering offenses that (a) had the same or substantially similar purpose, result, participant, victim, or method of commission, or were otherwise interrelated by distinguishing characteristics and are not isolated acts, (b) amounted to or posed a threat of continued criminal activity, and (c) were committed for financial gain. [*People v Martin*, 271 Mich App 280, 321; 721 NW2d 815 (2006).]

The Legislature defined an enterprise to include an individual or sole proprietorship, in addition to other entities or associations; it also stated that an enterprise includes both licit and illicit enterprises. See MCL 750.159f(a). Therefore, the evidence that defendant did business as Senior Planning Resource and worked through his company, Future By Design, was sufficient to establish that he was employed by or associated with an enterprise, even though those enterprises might also have been used to provide licit services. See *Martin*, 271 Mich App at 322. The key question was whether he participated in those enterprises through a pattern of racketeering activity.

A pattern of racketeering activity means "not less than 2 incidents of racketeering to which all of the following characteristics apply:"

---

[4] Decisions by lower federal courts are persuasive—but not binding—authority. See *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004).

(*i*) The incidents have the same or a substantially similar purpose, result, participant, victim, or method of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated acts.

(*ii*) The incidents amount to or pose a threat of continued criminal activity.

(*iii*) At least 1 of the incidents occurred within this state on or after the effective date of the amendatory act that added this section, and the last of the incidents occurred within 10 years after the commission of any prior incident, excluding any period of imprisonment served by a person engaging in the racketeering activity.  [MCL 750.159f(c).]

Racketeering means "committing, attempting to commit, conspiring to commit, or aiding or abetting, soliciting, coercing, or intimidating a person to commit an offense for financial gain by obtaining money, property, or any other thing of value, involving," in relevant part, a violation of MCL 750.174.  See MCL 750.159g(t).

As already discussed, the prosecution presented evidence from which a reasonable jury could have found that defendant embezzled Liddle's money on multiple different occasions, and that he did so through his enterprises involving investment advice and estate planning.  Those offenses were sufficient to establish that defendant participated in his enterprises through a pattern of racketeering.  Moreover, the evidence showed that defendant repeatedly targeted Liddle, along with other older persons as shown through the other-acts testimony, and used the proceeds to pay his personal expenses.  That evidence was sufficient to establish the remaining elements of racketeering.  See *Martin*, 271 Mich App at 326-327.

The prosecution presented sufficient evidence to establish each of the elements that defendant argues were insufficiently supported at trial.  Consequently, he has not established grounds for appellate relief.

IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next raises numerous claims of ineffective assistance of counsel, both in his brief on appeal and in a Standard 4 brief filed pursuant to Administrative Order 2004-6.  None of defendant's ineffective assistance claims warrant appellate relief.

A.  STANDARD OF REVIEW

Ordinarily, whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law—the trial court's factual findings supporting its decision are reviewed for clear error, while the court's determination of whether those facts violated the defendant's right to the effective assistance of counsel is reviewed de novo. *People v Dixon-Bey*, 321 Mich App 490, 515; 909 NW2d 458 (2017).  Defendant, however, failed to obtain an evidentiary hearing to expand the record, so there are no factual findings to which this Court must defer, and this Court's review is instead limited to errors apparent on the record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

## B. ANALYSIS

To establish a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Effective assistance is "strongly presumed," *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012), and the defendant bears the heavy burden of proving otherwise, *People v Dixon*, 263 Mich App 393, 396; 688 NW2d 308 (2004). If this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness. *Clark*, 330 Mich App at 427.

Defendant first argues that his trial counsel's preparation for trial was deficient. Defendant maintains that his counsel refused to look at a "large volume of documents from his businesses," which he claims pertained to Liddle. Defendant has not offered copies of these documents or even described their content on appeal, but simply asserts that the documents would have been helpful without further explanation. Defendant bears the burden of establishing the factual predicate for his claim that defense counsel's performance fell below an objective standard of reasonableness and prejudiced his trial, see *People v Odom*, 327 Mich App 297, 314; 933 NW2d 719 (2019), and in the absence of any support for the contention that these documents might have helped the defense, this Court cannot conclude that the failure to admit the documents prejudiced the defense, see *People v Carll*, 322 Mich App 690, 703; 915 NW2d 387 (2018).

Similarly, defendant largely fails to support his claim that his trial counsel's failure to subpoena various witnesses amounted to ineffective assistance. Defendant claims that Mike Murphy, Mark Pursley, Dorothy Wolvolek, and Rick AuMiller would have testified favorably to the defense. Defendant, however, has not offered an affidavit or other offer of proof to establish what three of the four witnesses—Murphy, Wolvolek, or AuMiller—might have stated had they been called to testify. "Without some indication that a witness would have testified favorably, a defendant cannot establish that counsel's failure to call the witness would have affected the outcome of his or her trial." *Id*.

Defendant did submit Pursley's affidavit in support of his claim on appeal. However, Pursley did not aver that he had any firsthand knowledge about the transfers of money from Liddle's accounts to defendant's accounts, nor did he say that he had any direct knowledge of Liddle's business dealings. Pursley merely averred that he had worked with defendant on "real estate projects and repairs" and found him to "be strictly professional in all of his dealings." The fact that Pursley had worked with defendant on real estate projects was minimally relevant to establish that defendant did in fact have legitimate real estate projects in which he could have invested money. Moreover, as already noted, whether defendant was involved in legitimate enterprises was not relevant to the charges he was facing, see *Martin*, 271 Mich App at 322—the question was whether defendant misappropriated Liddle's money and used it for his own ends. Pursley's proposed testimony would not have established that defendant had in fact invested Liddle's money in a real estate enterprise. Pursley also could not have stated whether defendant had the authority to take funds from Liddle's account and invest the money in such a project. Further, even if it was objectively unreasonable for defense counsel to not call Pursley, Pursley's marginally relevant evidence could not have had any conceivable effect on the verdict in light of

-17-

the strong evidence that defendant wrongfully took Liddle's money and actually spent it on personal expenses rather than real estate or some other investment. Therefore, defendant has not established a reasonable probability that, but for defense counsel's failure to call Pursley, the outcome at trial would have been different.

For similar reasons, defendant cannot establish that his trial counsel's failure to proffer evidence of defendant's real estate holdings amounted to ineffective assistance of counsel. Defendant again failed to establish the factual predicate for his claim that he owned investment properties. See *Odom*, 327 Mich App at 314. But even if he had offered evidence that he actually owned real estate as investments, defendant failed to demonstrate that there was a reasonable probability that, had the jury known about the real estate investments, the outcome would have been different. The mere existence of an investment does not establish that defendant had the authority to take Liddle's money and invest it in his properties.

Defendant's contention that his trial counsel should have called experts is likewise meritless. Defendant again failed to make an offer of proof to support this claim of error. He did not identify any expert who was willing and able to testify favorably to the defense. Accordingly, his claim fails. See *Carll*, 322 Mich App at 703.

In any event, defendant has not identified any need for experts. Defendants asserts that he needed banking or tax experts to testify about the intricacies of tax law and to explain the banking records. Whether income is taxable is a question of law; it is for the Court to instruct the jury on the applicable law, not a tax expert. Accordingly, an expert on taxation could not have offered any testimony about the proper application of the law to the facts. And defendant has not identified any basis for concluding that a tax expert would have shed light on whether defendant misappropriated Liddle's money. Defendant similarly does not identify any ambiguity in the banking records that might have been alleviated by expert testimony on banking procedures or record keeping. Given that the trial essentially came down to a credibility contest between defendant and Liddle, a reasonable defense lawyer could have concluded that it would be better to focus on whether Liddle authorized the transfers of money rather than complicate the trial with expert testimony that had limited evidentiary value. Consequently, even assuming that such experts were ready and willing to testify for the defense, defendant has not established that the decision not to call those experts fell below an objective standard of reasonableness.

Defendant also argues that his trial counsel should have called a medical expert to contest Liddle's mental and physical condition. Considering the evidence, however, a reasonable defense lawyer could conclude that there was no basis for doing so. There was undisputed evidence that Liddle had actually secured assistance and had numerous physical conditions that impaired her ability to live independently. There was no reason to believe that any medical professional would have testified that Liddle was capable of living independently, notwithstanding this evidence. Under the circumstances, defense counsel could have reasonably concluded that it would be better to elicit testimony on cross-examination of Liddle, her caregivers, and her physician that might suggest that Liddle's care needs were not so severe that she constituted a vulnerable adult. This is precisely what defense counsel attempted at trial. Accordingly, defendant failed to establish that defense counsel's decision not to call a medical expert fell below an objective standard of reasonableness.

In his Standard 4 brief, defendant argues that his trial counsel provided ineffective assistance by failing to prove that Liddle executed a note, which—in his view—would have definitively shown that she lent the money at issue to him. He concludes that the note would have served as an absolute defense to all the charges.

At trial, defendant testified that Liddle lent the money at issue to him and that the loan was memorialized by a note. The trial court admitted a copy of the note into evidence. Liddle, by contrast, testified that she did not lend defendant any money. Accordingly, the record demonstrates that defense counsel submitted evidence in support of defendant's theory of the case. Therefore, defendant's complaint in that regard is meritless.

Defendant also spends a significant amount of time discussing whether there was evidence that Liddle was competent to execute the note. Yet no one disputed Liddle's competency at trial; the question before the jury was whether Liddle had in fact entered into a contractually binding agreement to lend her money to defendant. Defendant presented evidence that he and Liddle had agreed that Liddle would lend defendant the money, but Liddle outright denied that she agreed to lend money to defendant or give him money to invest. The jury impliedly resolved that credibility dispute by rejecting defendant's evidence. The fact that defense counsel was unable to persuade the jury of defendant's position does not establish ineffective assistance of counsel. See *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001).

Defendant also argues that his trial counsel provided ineffective assistance by failing to challenge the trial court's instruction on the requirement that taxpayers report any gains on their tax return. After reviewing the instruction, we disagree. When read as a whole, the instruction at issue adequately protected defendant's rights by fairly presenting the issues to be tried. See *Martin*, 271 Mich App at 337-338. The contested instruction accurately reflected the law that income includes any accessions to wealth, clearly realized, and over which the taxpayer has complete dominion. *James*, 366 US at 219 (stating the definition of income under the current code).[5]

## V. SENTENCING VARIABLES

In his final argument, defendant contends that the trial court erred by assessing Offense Variable (OV) 4 at 10 points, OV 10 at 15 points, and prior record variable (PRV) 6 at 5 points. We disagree.

---

[5] In his Standard 4 brief, defendant makes other statements in his recitation of the facts that might be interpreted as additional claims of ineffective assistance. For example, he complains generally about his lawyer's performance during voir dire and criticizes defense counsel's handling of other-acts evidence. To the extent that these statements might be interpreted as additional claims of error, defendant has abandoned them by failing to identify them in his statement of the questions presented, see *People v Albers*, 258 Mich App 578, 584; 672 NW2d 336 (2003), and by failing to offer any meaningful discussion of the law or facts applicable to the potential claims, see *Martin*, 271 Mich App at 315.

## A. STANDARD OF REVIEW

"This Court reviews for clear error a trial court's findings in support of [a] particular score under the sentencing guidelines but reviews de novo whether the trial court properly interpreted and applied the sentencing guidelines to the findings." *McFarlane*, 325 Mich App at 531-532. Defendant failed to preserve his challenge to PRV 6, so this Court's review of that alleged sentencing error is for plain error affecting substantial rights. See *People v Anderson*, 322 Mich App 622, 634; 912 NW2d 607 (2018).

## B. OV 4

Defendant first asserts that the trial court erred by assessing 10 points for OV 4 because Liddle did not suffer a serious psychological injury.

The Legislature required trial courts to "[s]core offense variable 4" at 10 points if a victim suffered "[s]erious psychological injury requiring professional treatment" as a result of the offense. MCL 777.34(1)(a). Although the trial court may consider evidence that the victim sought professional treatment, whether the victim actually sought treatment "is not conclusive." MCL 777.34(2).

In her victim-impact statement—which the trial court could consider when making its findings, see *McFarlane*, 325 Mich App at 535—Liddle stated that she had lost confidence in her ability to make her own decisions and lost her trust in others. She also stated that, whereas before she did not have fears about living alone, she now wakes at night when she hears things and worries that defendant will send someone to hurt her. She explained that she now felt trapped in her home. She further wrote that she has nightmares about her day in court. She also told the trial court that she "suffered from a lot of stress," ate less, and was "more nervous and jumpy now." She closed by informing the court that she did not "want to die," but—at times—she would "welcome death to ease the suffering [that defendant] has created in [her] life."

Defendant dismisses Liddle's victim-impact statement as involving only concerns, stress, and trouble sleeping, which together do not rise to the level of requiring professional treatment. But this Court is not so dismissive of Liddle's description of the mental anguish that she has suffered. Liddle's statement is evidence that she suffered serious psychological injury that has made it much harder for her to live her normal life. Although there is no evidence that she has sought treatment for the injuries, the trial court could reasonably infer that her psychological injury was serious enough that it requires treatment. On this record, the trial court did not clearly err when it found that Liddle suffered a serious psychological injury requiring treatment; consequently, it did not err when it assessed 10 points under OV 4 on the basis of that finding. See *McFarlane*, 325 Mich App at 531-532.

## C. OV 10

Defendant next argues that the trial court erred when it assessed 15 points under OV 10. He contends that the record did not establish that he engaged in any preoffense conduct that qualified as predatory conduct, and suggests that the only evidence to support that finding was the evidence that he held investment seminars for older persons, which could not constitute predatory conduct because the seminars did not make his victims more vulnerable.

-20-

The Legislature stated that trial courts must "[s]core offense variable 10" at 15 points if the offense involved "[p]redatory conduct." MCL 777.40(1), (1)(a). The Legislature defined "predatory conduct" to mean "preoffense conduct directed at a victim, or a law enforcement officer posing as a potential victim, for the primary purpose of victimization." MCL 777.40(3)(a). Our Supreme Court has explained that the statute requires evidence that the perpetrator engaged in "behavior that precedes the offense, [is] directed at a person for the primary purpose of causing that person to suffer from an injurious action or to be deceived." *People v Cannon*, 481 Mich 152, 161; 749 NW2d 257 (2008). There must also be evidence that the victim was vulnerable, which means susceptible to injury, physical restraint, persuasion, or temptation. *Id*. at 158.

As discussed in Part III.B, there was significant evidence that Liddle was vulnerable within the meaning of MCL 750.145m(u)(*i*). That evidence was sufficient to support a finding that Liddle was also vulnerable for purposes of assessing MCL 777.40. See *Cannon*, 481 Mich at 158.

There was also record evidence that defendant engaged in preoffense conduct that he directed at Liddle for the purpose of making her a victim. Liddle testified that defendant befriended her and performed chores around her home. He even invited her to meet his family and attend his daughter's play. Defendant agreed that he befriended Liddle, and he stated that he never charged Liddle for his services. This evidence permitted an inference that defendant befriended Liddle and performed gratuitous services that were not the kinds of things that one's investment advisor would normally do in order to gain Liddle's trust and then take advantage of the relationship. The evidence suggested that he did so by appropriating Liddle's wealth for his own use. Taken as a whole, the trial court could infer that defendant targeted Liddle and won her trust in order to exploit her existing vulnerability and make her a victim of his crimes. The trial court did not clearly err when it found that defendant engaged in predatory conduct. Consequently, it did not err when it assessed 15 points under OV 10. See *McFarlane*, 325 Mich App at 531-532.

D.  PRV 6

Finally, defendant argues that the trial court erred when it assessed five points under PRV 6 because the PSIR listed the date of offense for all the offenses involved in his trial as having occurred on September 1, 2015, and he was no longer on probation on that date.

The trial court had to assess five points under PRV 6 if it found that defendant was on probation for a misdemeanor at the time he committed the sentencing offense. See MCL 777.56(1)(d). Defendant's PSIR states that defendant was on probation for operating a vehicle while intoxicated, which ended in October 2011. The PSIR listed the date of the offenses at issue as all having occurred on a single date: September 1, 2015. Nevertheless, the PSIR also listed the offense date of all 14 counts as March 1, 2011. Moreover, there was evidence at trial that defendant started misappropriating Liddle's wealth in March 2011. Accordingly, there was evidence in the record to support the trial court's implied finding that defendant committed the sentencing offense while he was still on probation for his operating-while-intoxicated offense. Therefore, this Court cannot conclude that the trial court plainly erred when it assessed five points under PRV 6. See *Anderson*, 322 Mich App at 634-635. Moreover, given the support in the record, defense counsel cannot be faulted for failing to make a meritless objection to the score. See *Clark*, 330 Mich App at 426.

## VI. CONCLUSION

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Jane M. Beckering
/s/ Colleen A. O'Brien